IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BRIAN ARMON DUCKSWORTH,

                Plaintiff,                      OPINION AND ORDER

v.

                                      22-cv-149-wmc

TAMMY MAASSEN,

                Defendant.

---

This court granted plaintiff Brian Ducksworth, who is representing himself, leave to proceed on his Eighth Amendment claim against defendant Tammy Maassen for allegedly exposing him to other inmates who had tested positive for COVID-19 while Ducksworth was a prisoner at Jackson Correctional Institution ("Jackson"). (Dkt. #9.) Maassen subsequently filed a motion for summary judgment on the merits of plaintiff's claim. (Dkt. #28.) For the following reasons, the court will now grant her motion for summary judgment.[1]

UNDISPUTED FACTS[2]

**A. Background**

Plaintiff Ducksworth's claim arises out of alleged events at Jackson in December

---

[1] For this reason, the court need not reach defendant's alternative assertion of qualified immunity.

[2] Unless otherwise indicated, the following facts are material and undisputed after considering the parties' proposed factual findings, responses, and the evidence of record in a light most favorable to plaintiff. *See Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) ("We must . . . construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true.").

2021. At that time, defendant Maassen was employed by the Wisconsin Department of Corrections ("DOC") as the manager of Jackson's Health Services Unit ("HSU"). Maassen has been licensed as a registered nurse in Wisconsin since 1989.

### B. Jackson's Response to COVID-19

Like other DOC institutions, Jackson responded to the risks presented by the COVID-19 pandemic in a variety of ways, including restricting internal movement within its facility, forbidding outside visitors, and providing inmates with face masks. Jackson also relied on isolating and quarantining inmates to slow the spread of COVID-19. In particular, inmates were placed on "isolation status" if they *tested positive* for COVID-19, while inmates were placed on "quarantine status" if they were (1) exposed to COVID-19, (2) exhibiting symptoms but had not yet received a positive COVID-19 test, or (3) recently transferred into the facility. Jackson also gave inmates the opportunity to receive COVID-19 vaccines when they became available.[3]

Later, when COVID-19 numbers were manageable at Jackson, prison staff used the facility's Oxbow Unit to isolate and quarantine all inmates who had (1) tested positive for COVID-19, (2) shown symptoms of COVID-19, (3) otherwise been exposed to the virus, or (4) required isolation in advance of a transfer to another facility. Oxbow was the most controlled separation area at Jackson, containing double occupancy, so-called "wet" cells

---

[3] By the summer of 2021, nearly two-thirds of inmates in DOC custody had reportedly been fully vaccinated against COVID-19. Emily Hamer, *COVID-19 cases in Wisconsin prisons drop to zero for 1st time since pandemic hit*, WISCONSIN STATE JOURNAL (June 29, 2021), https://madison.com/news/local/crime-and-courts/covid-19-cases-in-wisconsin-prisons-drop-to-zero-for-1st-time-since-pandemic-hit/article_909f0aa1-62aa-519e-b137-2698e05ad48d.html.

with their own toilets and sinks. By using wet cells, Jackson was able to isolate or quarantine inmates inside of their own cells, thereby limiting unnecessary movement and contact with other inmates and prison staff. However, Jackson could not prevent the spread of COVID-19 entirely.

### C. Maassen's Responsibilities at Jackson

In her role managing Jackson's HSU, Maassen was responsible for implementing and adhering to recommendations from DOC's Bureau of Health Services ("BHS"), which would promulgate COVID-19 response procedures. Maassen would then use these BHS procedures to educate HSU and correctional staff at Jackson on best practices for COVID-19 isolation and quarantine at the facility. However, as HSU manager, Maassen did not have the authority to create COVID-19 policies or guidelines independently, nor could she decide to move inmates from one unit to another on her own. Instead, HSU's advanced care providers and Maassen worked collaboratively with correctional officers and security staff to determine what inmate moves would best protect Jackson's inmate population and staff, after taking into account medical restrictions, security considerations, and COVID-19 immunity.

### D. December 2021 COVID-19 Testing

On December 7, 2021, the Wisconsin National Guard ("WING") also came to Jackson to conduct mass COVID-19 testing of inmates at the facility. Jackson received the results of WING's mass testing from the Wisconsin Department of Health Services on December 13, 2021. Maassen had no control over the turnaround time for those test

results, nor was she made aware of any individual inmate's COVID-19 status until after the results were received.

As some validation for Jackson's isolation and quarantine procedures, the mass testing results showed that 11 inmates had tested positive for COVID-19, *all* of whom were housed in the Oxbow unit. Moreover, six of those inmates were roommates with other inmates who tested positive. Maassen further represents that in response to the 11 positive tests, Jackson staff moved the inmates who tested positive, their cellmates, and any unvaccinated inmates in the unit to the B-side of Oxbow for additional quarantine and isolation. Nevertheless, Ducksworth contends that five of the eleven inmates who tested positive remained unquarantined on the A-side of Oxbow. Regardless, by the time Maassen received the results of WING's December 7, 2021 mass testing, some inmates who turned out to have tested positive had been interacting for a week with inmates who ultimately tested negative.

E. Ducksworth's Purported COVID-19 Exposure

While it is undisputed that his test results from that event were negative, Ducksworth at least implies that he may have personally contracted COVID-19 sometime after the WING mass testing event, although after displaying symptoms of COVID-19, Ducksworth again tested negative for COVID-19 on February 9, 2022. In fact, there is *no* record of Ducksworth having tested positive during the relevant period in this case.[4]

---

[4] In his declaration, Ducksworth does aver to having tested positive for COVID-19 on August 18, 2020, and as a result, to knowing what "the physical symptoms felt like" in December of 2021.

4

Instead, Ducksworth claims that his exposure to other prisoners who tested positive for COVID-19 caused him extreme stress, anxiety, and psychological damage.

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The nonmovant must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish there is a genuine triable issue, which requires him to do more than simply show that there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

I. Plaintiff's Eighth Amendment Claim

The Eighth Amendment gives prisoners the right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements: (1) an objectively serious medical need; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). A medical need is "serious" if it: so obviously requires treatment that even a lay person could recognize the need for medical attention; carries

risk of permanent serious impairment if left untreated; results in needless pain and suffering; *or* significantly affects an individual's daily activities. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241-42 (7th Cir. 2021); *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997). "Deliberate indifference" means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it, which is a decidedly high standard by itself. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Thus, acts of deliberate indifference require more than negligence, or even gross negligence, but require something less than purposeful acts. *Farmer v. Brennan*, 511 U.S. 825, 835-36 (1994).

Because defendant Maassen is a medical professional, the relevant question under the Eighth Amendment is whether her action was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996).

A. **Serious Medical Need**

At least some courts have held that the risk of exposure to COVID-19 in prison can satisfy the objective standard of an Eighth Amendment claim. *E.g., Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (acknowledging that "[t]he COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death"). However, to prevail on a deliberate indifference claim, a plaintiff must provide proof of an objectively significant risk of harm that has "in fact materialize[d]." *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023). Defendant argues that plaintiff's inability to prove he had

6

COVID-19 during the relevant period is fatal to his claim. To begin, it appears conceded that plaintiff did *not* test positive for COVID-19 at any point between December 7, 2021, and February 9, 2022, nor has plaintiff pointed to any other evidence suggesting he contracted the virus during this period, beyond his own subjective assertion of knowing what symptoms are consistent with COVID-19. Generally, if plaintiff "want[s] to recover money damages solely for the risk to his life," to which he alleges defendant was deliberately indifferent, "[t]hat risk is not compensable without evidence of injury[.]" *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020).

In response, plaintiff contends that his exposure to another inmate who tested positive for COVID-19 on the morning of September 14, 2021 -- one day after defendant received the inmates' test results -- constituted a serious medical need due to the "emotional[], psychological[], and physical[]" trauma that plaintiff has experienced since, including the "nightmares, severe anxiety, high blood pressure, [and] COPD" that he now experiences. (Pl.'s Brief in Opp. (dkt. #34) 7-8.) Of course, the Eighth Amendment may protect prisoners from conditions that pose a substantial risk of damage to an inmate's *future* health, such as exposure to environmental toxins, at least if contrary to contemporary standards of decency. *See Helling v. McKinney*, 509 U.S. 25, 35-36 (1993) (prisoner's Eighth Amendment claim could be based upon possible present or future harm to health arising out of exposure to second-hand tobacco). Yet plaintiff does not assert, much less offer evidence, that he is facing some future risk of exposure to COVID-19 merely by being exposed to it in December of 2021, nor does he assert or provide evidence that any aspect of his health has been placed at higher risk of experiencing severe illness or complications

7

if he were to contract the COVID-19 virus going forward due to such an exposure. *See Henry v. Deshler*, No. 20-2185, 2021 WL 2838400, at *2 (7th Cir. July 8, 2021) ("unless a prisoner is challenging a failure to protect him from a serious risk of *future* harm [ . . . ] a claim of deliberate indifference cannot be based on a risk that never came to pass"); *United States v. Ferry*, 457 F. Supp. 3d 1163, 1174 (D.N.M. May 6, 2020) (in the context of a motion for release pending sentencing, finding that a generalized risk of exposure to COVID-19 in jails and prisons was insufficient to establish a substantial risk of damage to future health of criminal defendant). To succeed on a future harm claim, plaintiff would need to show "to a degree of reasonable medical certainty" that he actually faced an increased risk of future injury. *Gray v. Hardy*, 826 F.3d 1000, 1007 (7th Cir. 2016). Plaintiff has not done so here.

At bottom, plaintiff appears to seek relief for purely psychological harms, such as nightmares and anxiety, or for physical injuries -- such as high blood pressure or COPD -- that he has not begun to show could be causally linked to any COVID-19 exposure in December of 2021. Therefore, the court cannot find any evidentiary basis for a reasonable jury to conclude that plaintiff experienced an objectively serious medical condition entitling him to proceed to trial on his Eighth Amendment claim. *See Leiser v. Kloth*, 933 F.3d 696, 703 (7th Cir. 2019) ("not every psychological discomfort a prisoner endures amounts to a constitutional violation"); *Button v. Harden*, 814 F.2d 382, 383 (7th Cir. 1987), *abrogated on other grounds by Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004) (to prevail under § 1983, a plaintiff must show not only that his federal rights were violated but also

that, "had it not been for the violation, the injury of which he complains would not have occurred").[5]

### B. Deliberate Indifference

Even if plaintiff's claim for exposure to fellow prisoners with COVID-19 could constitute a serious medical need, no reasonable jury could find that defendant Maassen was deliberately indifferent to that need. The key inquiry is not whether defendant *perfectly* responded to the risk plaintiff faced or whether defendant's efforts eventually averted the risk; instead, the relevant question is whether she "responded reasonably to the risk." *See Wilson*, 961 F.3d at 840-41 (quoting *Farmer*, 511 U.S. at 844); *see also Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) ("prison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted").

Here, it is undisputed that defendant participated in mitigating the risk of COVID-19 contagion at Jackson in her role as HSU manager, including by adhering to and implementing recommendations from BHS and educating Jackson staff on those recommendations. Jackson also implemented a series of quarantine and isolation

---

[5] The Prison Litigation Reform Act does not permit prisoners to recover compensatory damages "for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18)." 42 U.S.C. § 1997e(e). Plaintiff has not provided any evidence of a physical injury stemming from the events described in the Amended Complaint. (*See* Pl.'s Brief in Opp. (dkt. #34) 4-5 (alleging "nightmares, severe anxiety, high blood pressure, COPD" that were "further aggravated" by plaintiff's exposure to COVID-19).) Consequently, even if plaintiff could successfully demonstrate a violation of a constitutional right, he would at most be entitled to punitive damages or nominal damages of $1. *See Calhoun v. DeTella*, 319 F.3d 936, 943 (7th Cir. 2003).

procedures that appear to have been generally followed. Indeed, the record as a whole shows that defendant and other staff at Jackson did their best to prevent all inmates, including Ducksworth, from getting infected with the virus at the institution, especially considering that information about the COVID-19 virus and its contagiousness, much less best efforts to mitigate its spread, were moving targets in and out of correctional institutions throughout this period. Thus, if a facility has taken tangible steps towards minimizing the risk of COVID-19 infection, a prisoner will fall "well short" of establishing that the facility or members of its staff were deliberately indifferent toward his medical needs in light of the virus, even though they cannot entirely "eliminate all risk" of contracting COVID. *Hope v. Warden York Co. Prison*, 972 F.3d 310, 320-31 (3d Cir. 2020).

Regardless, plaintiff must also demonstrate that it was possible for defendant to address his specific medical need. Here, it is conceded that Maassen could not independently create her own COVID-19 policies or guidelines, nor could she decide to move inmates from one unit to another on her own. The crux of plaintiff's complaint is that on the morning of December 14, 2021, he was exposed to another inmate who defendant later learned had tested positive for COVID-19 one day earlier but had not yet been moved into quarantine. (Pl.'s Brief in Opp. (dkt. #34) 4-5.) Aside from a conclusory suggestion that defendant "could have made contact with other officials[,]" however, plaintiff has identified no remedial action *defendant* could have taken to prevent this brief interaction from taking place, nor has he pointed to any evidence suggesting that defendant knowingly or negligently required plaintiff to interact with any other inmates in the Oxbow unit who had tested positive for COVID-19. (*See* Pl.'s Resp. to Def.'s Proposed Findings

10

of Fact (dkt. #35) 4.) Ultimately, defendant cannot be held liable under the Eighth Amendment "if the remedial step was not within [her] power." *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012).

Because it is undisputed that defendant (1) implemented and followed procedures to contain and prevent the spread of COVID-19 at Jackson; and (2) never knowingly or negligently exposed plaintiff to any inmate who had tested positive or recently been exposed to COVID-19, no reasonable jury could conclude that defendant was deliberately indifferent to plaintiff's safety. Accordingly, summary judgment will be entered in favor of defendant Maassen.

## ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #28) is GRANTED and final judgment shall be entered against plaintiff Ducksworth on his Eighth Amendment claim.

2) Plaintiff's motion to dismiss defendant's motion for summary judgment (dkt. #33) is DENIED.

3) Defendant's motion to stay deadlines (dkt. #43) and plaintiff's motion in limine (dkt. #44) are DENIED AS MOOT.

4) The clerk of court is directed to enter final judgment.

Entered this 19th day of December, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge